UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

----ooOoo----

JUNE L. PLAYFAIR,

    Plaintiff,

v.

SOUTH LEMHI SCHOOL DISTRICT 292 BOARD OF TRUSTEES; VON BEAN, a board member; JAMES WHITTAKER, a board member; CARL LUFKIN, a board member; ROSS GODDARD, a board member; and DEB FOSTER, a board member;

    Defendants.
_____/

NO. CIV. 09-375

MEMORANDUM AND ORDER RE: MOTION FOR PRELIMINARY INJUNCTION

----ooOoo----

Plaintiff June L. Playfair initiated this action to enjoin a scheduled hearing about the non-renewal of her contract with South Lemhi School District No. 292 ("district"). Plaintiff specifically alleges that the defendant Board of Trustees of the district ("Board") cannot fairly preside over her due process hearing because it already made a decision to terminate her employment during an executive session and with a public vote at a board meeting on May 11, 2009.

1

The due process hearing at issue was originally scheduled for June 4, 2009, and, after being rescheduled at least twice, was set for August 4, 2009, at 2:00 p.m. On July 23, 2009, plaintiff filed a verified complaint in state court, alleging violations of her federal and state due process rights and seeking to enjoin defendants from "sitting and participating as decision makers" for her hearing. (Compl. 4.) Pursuant to 28 U.S.C. § 1441(b), defendants removed the case to federal court on August 3, 2009, and plaintiff filed a motion for a temporary restraining order and/or preliminary injunction the same day.

On August 4, 2009, Judge Winmill granted plaintiff's motion for a temporary restraining order and, pursuant to Federal Rule of Civil Procedure 65(c), required plaintiff to post a $500 security bond. Judge Winmill's Order temporarily restrained the Board "from conducting a Due Process Hearing concerning Plaintiff's continued employment with School District No. 292 until such time as this Court can take further evidence and determine whether the School District No. 292 board members should be permanently enjoined from conducting the hearing currently scheduled for August 4, 2009." (Aug. 4, 2009 Order at 6.)

On August 10, 2009, the undersigned held an evidentiary hearing on plaintiff's motion for a preliminary injunction. At the hearing, the court received exhibits; heard testimony from plaintiff, the Board defendants--which include Von Bean, James Whittaker, Carl Lufkin, Ross Goddard, and Deb Foster--and the district superintendent, Dr. Susan Noland; and heard oral argument from counsel. This memorandum constitutes the court's

findings of fact and conclusions of law following the hearing.

In his Order granting plaintiff's temporary restraining order, Judge Winmill reasoned that, "without evidence about the goings on during the executive session, which defendants could have provided, the Court and Plaintiff are without all the potentially relevant information needed to determine whether the board members already made a determination regarding Ms. Playfair's contract." (Id. at 5.) Based in part on this lack of information, Judge Winmill concluded that plaintiff had satisfied her burden of establishing that she will likely suffer a denial of due process in the absence of preliminary relief. The evidence presented at the August 10, 2009 hearing supports Judge Winmill's initial finding that the Board likely reached a decision about plaintiff's continued employment at the May 11 board meeting and thus merits granting plaintiff's motion for a preliminary injunction.

Events Leading to and the Actions Taken at the Board Meeting

Since 1985, plaintiff has been a teacher at Leadore School, which is within the district and serves the small farming town of Leadore in Lemhi County, Idaho. The town itself has approximately 100 to 120 citizens and approximately thirty to thirty-two students are currently enrolled in high school at Leadore School, which makes it the smallest public high school in Idaho. About twenty years ago, plaintiff instituted the Vocational Agriculture Program ("Vo-Ag Program") at the high school and has operated and taught the courses within that program since its creation. Given plaintiff's role within the Vo-Ag Program, plaintiff and members of the Board view plaintiff

3

and the Vo-Ag Program as essentially one in the same.

In 2008, Noland became the new superintendent of the district and learned that the district was facing financial challenges. Based in part on decreased enrollment and state funding, the district allegedly faced a shortfall of approximately $112,000 for the 2009-2010 school year. In light of its deficit, the district allegedly began discussing programs that might be cut and, in April 2009, held a public hearing to address possible reductions.

Around the same time, the Agriculture Advisory Committee, which is responsible for discussing the direction of the Vo-Ag Program, also held meetings to discuss the Vo-Ag Program. At these meetings, the Vo-Ag Committee Members, which included plaintiff, Bean, and Foster, discussed the possibility of modifying the Vo-Ag Program to include more industrial arts, such as mechanics and welding courses. At these meetings, some of which Noland attended, the committee also discussed the possibility of plaintiff taking training courses over the summer to enable her to teach the mechanic and welding courses. When plaintiff applied to take this training, however, Noland allegedly denied her request.

On May 11, 2009, the Board held a public meeting and issued an agenda in advance of the meeting. (Rammell Aff. Ex. B.) Among other "Business Items" listed on the agenda, the agenda included "Recommendations for Vo-Ag Program": the "Ag Advisory Committee Report" by Foster and the Superintendent's recommendation. (Id.) The agenda also indicated that an Executive Session would be held to discuss "Personnel - Ag" and

4

"Ag Supplemental." (Id.) Prior to the scheduled board meeting, some of the board members met for a private work session for about thirty minutes, at which time budgetary issues were discussed.

Although the agenda indicated that Foster would deliver the Ag Advisory Committee Report, she subsequently recused herself from delivering the report and participating in the discussions and executive session about the Vo-Ag Program and plaintiff's position. (Id. at Ex. A at 2.) Instead of Foster, Bean delivered the Ag Advisory Committee Report, which "recommended changing from Ag Science Format to AG Mechanics-AG Shop Program for a higher quality project oriented program." (Id.)

Prior to the planned discussion about the Vo-Ag Program and plaintiff's position, Noland also "presented a proposed class schedule," which the Board approved. (Id.) When plaintiff requested a copy of the schedule, she learned for the first time that her name was omitted as a teacher. The schedule's omission of plaintiff as a teacher conflicted with a schedule Noland had given plaintiff that morning during an evaluation. When plaintiff asked Noland why her name was excluded, Noland told her that, "You are off for a reason."

After voting to approve Noland's schedule, Noland "recommended eliminating the AG Program due to lack of student interest as demonstrated by class pre-registration for the 2009-2010 school year sufficient to justify offering the program." (Id. at 3.) Whittaker made a motion to table Noland's recommendation until after the executive session, and the motion

5

carried. (Id.) The Board then began an executive session at 9:55 p.m., indicating in the resolution that the purpose of the executive session was "Personnel" and authorized by Idaho Code section 67-2345(1)(b). (Id.)

After the Board met in executive session for approximately ten to fifteen minutes, Bean approached plaintiff in a hallway and asked her whether she wanted to speak on her behalf to the Board. When plaintiff indicated she was unsure about what she would say, Bean suggested she take five to ten minutes to collect her thoughts and then join the Board. After about five to ten minutes, plaintiff joined the Board for the executive session and discussed the Vo-Ag Program and her position with the Board for approximately fifteen to twenty minutes. The Board then finished the executive session without plaintiff and reconvened the public session at 10:30 p.m. (Id.)

Immediately after reconvening the public session, Bean made a successful motion to "bring [the Advisory Committee's] recommendation for the VO-AG program off the table." (Id.) Following that action, the Board voted to "approve the recommendation of Superintendent Noland to eliminate the Ag Science Program due to lack of interest and enrollment in the program." (Id.) Noland then "made a recommendation of non-renewal of Mrs. June Playfair[']s contract for the reason of eliminated program and is not certified or qualified for any position open and advertised." (Id.) In response to Noland's recommendation, the minutes memorialized that the Board voted to accept it:

Von Bean made a motion to accept the recommendation of

Dr. Noland. Carl Lufkin seconded the motion. The motion carried. Dr. Noland recommended non-renewal of the Supplemental AG Contract. Carl Lufkin made a motion to accept the recommendation of Dr. Noland of non-renewal of Supplemental Contract. Von Bean seconded the motion. The motion carried. A notice will be promptly provided to Mrs. Playfair of her right to a due process hearing which is set for June 4th unless Mrs. Playfair waives her right to a hearing or a change of the date of that hearing is necessary.

(Id. at 3-4.)

Sometime that evening, plaintiff received a "Notice of Nonrenewal of Contract for School Year 2009-2010" signed by Board Chairperson Goddard and a "Notice of Hearing." (Id. Ex. C, E.) In the three-paragraph body of the notice of non-renewal, plaintiff was informed that "the Superintendent has recommended that you NOT be offered a contract for the 2009-2010 school year." (Id. Ex. C.) The notice did not indicate or suggest that the Board voted on the Superintendent's recommendation, and Noland claims that she informed plaintiff that evening "that she had not been terminated, but only that a recommendation had been made not to renew her contract." (Noland Aff. ¶ 14.)

In response to the apparent indication in the meeting minutes that the Board voted to accept the Superintendent's recommendation, each of the voting board members submitted an affidavit stating that the Board voted only to "accept the Superintendent's recommendation to hold a hearing, and scheduled a due process hearing accordingly." (Von Bean, Lufkin, Whittaker, & Goddard Affs. ¶ 7 (emphasis added); see Foster Aff. ¶ 3 (indicating that she recused herself from the decision about the Vo-Ag Program or recommendation of non-renewal of plaintiff's contract because of her "previous encounters" with plaintiff as a

7

parent).) At the hearing, the board members essentially offered the same testimony. Defendants also contend that plaintiff did not believe her position was terminated at the May 11 meeting because her husband subsequently placed an ad in the paper announcing the public hearing about the "[o]pen termination hearing for [the school's] Agricultural Program Teacher June Playfair." (Noland Aff. Ex. D.)

As school is scheduled to start on September 1, 2009, the court expedited its hearing and ruling on plaintiff's motion for a preliminary injunction.

### Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Defense Council, Inc., 129 S. Ct. 365, 374 (2008) (citing Munaf v. Geren, 128 S. Ct. 2207, 2218-19 (2008); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)). In Winter, the Court reaffirmed the traditional standard for granting a preliminary injunction and rejected the Ninth Circuit's variations of the standard, such as requiring only a "possibility" of irreparable harm if the plaintiff shows a strong likelihood of prevailing on the merits. Id. at 375.

The Winter Court further emphasized that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." Id. at 376. "In each case, courts 'must balance

the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Id. (quoting Amoco Prod. Co., 480 U.S. at 542). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Id. at 376-77 (quoting Romero-Barcelo, 456 U.S. at 312).

### Plaintiff's Due Process Rights

"It is well-settled that the Due Process Clause prevents the state from depriving a plaintiff of a protected property interest without 'a fair trial in a fair tribunal.'" Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995) (quoting In re Murchison, 349 U.S. 133, 136 (1955)); see Brady v. Gebbie, 859 F.2d 1543, 1554 (9th Cir. 1988) ("[T]he fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner.") (citing Mathews v. Eldridge, 424 U.S. 319, 333 (1976)) (emphasis added). "In attempting to make out a claim of unconstitutional bias, a plaintiff must 'overcome a presumption of honesty and integrity' on the part of decision-makers" and "show that the adjudicator 'has prejudged, or reasonably appears to have prejudged, an issue.'" Stivers, 71 F.3d at 741 (quoting Withrow v. Larkin, 421 U.S. 35, 46 (1975); Kenneally v. Lungren, 967 F.2d 329, 333 (9th Cir. 1992)) (emphasis added).

A hearing does not comport with due process if it "'is totally devoid of a meaningful opportunity to be heard'" because the decision-makers have predetermined the outcome of the hearing. Matthews v. Harney County, Or., Sch. Dist. No. 4, 819

F.2d 889, 893-94 (9th Cir. 1987) (quoting <u>Washington v. Kirksey</u>, 811 F.2d 561, 564 (11th Cir. 1987)); <u>see</u> <u>id.</u> ("'Due process of law [is not present] where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard.'") (alteration in original); <u>see also</u> <u>Brady</u>, 859 F.2d at 1554 (upholding a jury verdict finding a due process violation when the "jury could reasonably infer from th[e] evidence that [the decision-maker] had made up her mind about [plaintiff] before the meeting and would have disregarded any evidence which [plaintiff] presented in mitigation or rebuttal"); <u>Bakalis v. Golembeski</u>, 35 F.3d 318, 326 (7th Cir. 1994) ("Certainly, a body that has prejudged the outcome cannot render a decision that comports with due process."); <u>see also</u> <u>Johnson v. Bonner County Sch. Dist. No. 82</u>, 887 P.2d 35, 39 (Idaho 1994) ("[W]e conclude that upon a showing that there is a probability that a decisionmaker in a due process hearing will decide unfairly any issue presented in the hearing, a trial court may grant an injunction to prevent the decisionmaker from participating in the proceeding.").

At the same time, however, "[m]ere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not[] disqualify a decisionmaker." <u>Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n</u>, 426 U.S. 482, 493 (1976). "Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" <u>Id.</u> (quoting

10

United States v. Morgan, 313 U.S. 409, 421 (1941)); see Withrow, 421 U.S. at 55 ("The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing."); accord Johnson, 887 P.2d at 38.

Here, the parties agree that plaintiff has a protected property interest in her position with the district, that she will suffer irreparable harm if she is deprived of that property interest without due process of law, and that she is entitled to a hearing.[1] The parties dispute only whether the Board made a decision about plaintiff's continued employment at the May 11, 2009 board meeting and whether the Board can serve as a "fair tribunal" over plaintiff's subsequent due process hearing.

### The Board Reached a Decision on May 11, 2009

In light of the testimony at the hearing and the board minutes, the court finds that the Board voted to terminate the Vo-Ag Program and plaintiff's position on May 11, 2009, and plaintiff is thus likely to succeed on her due process claims.

---

[1] With a public employment property interest, the Supreme Court has held that a pre-termination "hearing" is required to serve as an "initial check," but it "need not be elaborate" if the employee is entitled to a full post-termination hearing. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985); see also Mathews, 424 U.S. at 334-35 (establishing the balancing test to determine what process is due in an individual case). Because defendants contend that plaintiff's position was not terminated at the May 11, 2009 board meeting, they do not argue that the brief May 11, 2009 executive session at which plaintiff was given approximately five to ten minutes notice that she could speak on her behalf served as a pre-termination hearing and that the August 4, 2009 hearing would have served as a post-termination hearing. See generally Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'")

11

First, prior to even discussing the Vo-Ag Program or plaintiff's position, Noland distributed--and the Board approved--a class schedule for 2009-2010 that omitted the Vo-Ag Program and plaintiff's position. Second, in identifying its reason for holding an executive session, the Board relied on Idaho Code section 67-2345(1)(b), which authorizes executive sessions "[t]o consider the evaluation, dismissal or disciplining of, or to hear complaints or charges brought against, a public officer, employee, staff member or individual agent, or public school student." Third, the minutes unequivocally indicate that the Board voted to "accept" the Superintendent's recommendation for the non-renewal of plaintiff's contract. Lastly, despite the conclusion of the pertinent executive session at 10:30 p.m. and the adjournment of the board meeting at 11:10 p.m., the Board still managed to give plaintiff a typed, three-paragraph notice of non-renewal that same evening, which suggests that the letter might have been prepared before the board meeting or during the executive session.

      The board members' representations that they were voting only about whether to hold a hearing is also inconsistent with section 33-513, which provides that, "[u]pon receipt" of a notice of non-renewal of a contract from the Superintendent, the board "<u>shall</u> give the affected employee written notice of the allegations and the recommendation of discharge, along with written notice of a hearing before the board prior to any determination by the board of the truth of the allegations." Idaho Code § 33-513(5)(b) (emphasis added). Under this mandatory language, the Board thus lacked discretion to vote on whether to

12

hold a hearing and any vote to do so would appear to be meaningless.

In finding that the Board's decision to terminate the Vo-Ag Program and plaintiff's position violated plaintiff's due process rights, the court does not find that the board members acted maliciously or with the intent to deprive plaintiff of her constitutional rights. The court believes that the board members, who are untrained in the law, felt they were following the procedures in section 33-515 and only inadvertently deprived plaintiff of her rights.

It is obvious that the Board's decision to accept Noland's recommendation not to renew plaintiff's contract cannot stand. Similarly, as the board members viewed plaintiff's position as essentially synonymous with the Vo-Ag Program, its decision to terminate that program suffers from the same constitutional deficiencies. Nonetheless, finding that the Board's decision to terminate the Vo-Ag Program and plaintiff's position deprived plaintiff of due process far from resolves this case because the court must still determine how to remedy plaintiff's constitutional injury. The more difficult issue, therefore, is determining the equitable remedy the court should fashion to ensure plaintiff is afforded due process and the public's interest is not harmed. See Winter, 129 S. Ct. 365 at 376-77 ("'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" (quoting Romero-Barcelo, 456 U.S. at 312)).

///

13

## Determining the Proper Equitable Remedy

The court has considered the various suggestions plaintiff's counsel proposed at oral argument, including having the matter heard by the Lemhi County Commissioners, by another board of a school district of comparable size, or by some ad hoc committee of impartial citizens. Although initially appealing, none of these remedies are appropriate or satisfactory and all of them pose significant risks to the public's interests. First, judicially empowering another body to decide the district's course offerings and employees would usurp the legislature's delegation of authority and potentially violate the rights of the citizens who elected the board members to make such decisions. See Idaho Code § 33-513(5). Cf. Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 493-94 (1976) ("The Fourteenth Amendment permits a court to strip the [school] Board of the otherwise unremarkable power [to discharge employees that] the Wisconsin Legislature has given it only if the Board's prior involvement in negotiating with the teachers means that it cannot act consistently with due process.").

Second, not only would an ad hoc body be untrained in and unaware of the multitude of considerations required to make such policy, education, and budgetary decisions, such a body would be wholly unaccountable to the relevant constituents. The citizens in Lemhi would thus be compelled to follow a decision about what classes are taught in their schools and who teaches their children that is handed down by an artificially empowered body that is neither accountable to nor elected by the citizens of Lemhi. This court is not willing to use its equitable powers

to displace the system of representative government at the local level in order to remedy a constitutional violation.[2]

The court is thus left with a practical choice between ordering the Vo-Ag Program and plaintiff reinstated for either an unspecified or specified period of time[3] or allowing the Board to render a decision after providing plaintiff a full and fair opportunity to be heard. Consideration of the first alternative raises several major concerns. First, as it is undisputed that the district's funding is unable to meet its current obligations, reinstating the Vo-Ag Program and plaintiff's position would inevitably require the district to make cuts in other programs or services. While continuing the Vo-Ag Program and plaintiff's position may very well be in the public's interest, this court is neither able to assess which programs or services would best serve the public interest nor able to predict the ripple effects of such an injunction. Second, any injunction ordering the reinstatement of the Vo-Ag Program and plaintiff's position would have to be subject to reconsideration at some point. Not only would this force the court to select an arbitrary date that

---

[2] As elected officials of Lemhi County, the County Commissioners come closest to avoiding the court's concerns about non-elected officials rendering the decision; however, requiring them to make the decision does not address the court's concerns about their unfamiliarity with the competing policy, education, and budgetary issues and raises additional concerns because one of the County Commissioners is plaintiff's neighbor.

[3] The court refers to reinstatement of the Vo-Ag Program and plaintiff's position together based on the witnesses' impressions that the Vo-Ag Program and plaintiff's position are essentially synonymous. The court recognizes and intends its analysis to include the varying injunctions that could be issued or decisions that could be made, such as renewing plaintiff's contract to teach courses outside of the Vo-Ag Program or within a modified Vo-Ag Program.

15

cannot account for how circumstances might change, it would also necessarily invite further litigation as to whether the circumstances at some unpredictable date had sufficiently changed.

While allowing the Board to render a decision after a fair hearing also poses concerns, the concerns are more readily reconciled and strike the fairest balance between protecting plaintiff's due process rights and the public's interests. Many of the concerns plaintiff identifies with having the Board render a decision do not rise to the level of unconstitutional bias and would exist even if the Board had not rendered a decision on May 11, 2009. These concerns include the fact that plaintiff's and the board members' children attend school together, plaintiff has taught the board members' children, and three of the board members attend church together. These realities are unavoidable in governing bodies that are run by elected members of the community and are virtually inescapable in a small town with less than 150 citizens.

Aside from board member Foster, who recused herself because of personal reasons, neither plaintiff nor the board members suggested that any of the voting board members questioned plaintiff's teaching abilities, had unfavorable impressions of her, or harbored a personal bias against her. At most, plaintiff and some of the witnesses suggested that "rumors" have resulted from the May 11, 2009 board meeting. Vague rumors that one or more board members might have heard do not raise to the level of unconstitutional bias. See Stivers, 71 F.3d at 741.

The second type of concern raised by plaintiff comes

within the concept that, once individuals have made a decision, they cannot easily change their minds. While there is not an easy answer to this problem, the board members are public servants who took an oath to act fairly, and they make quasi-judicial decisions on a regular basis. See Withrow, 421 U.S. 35 at 55 ("Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'"). Most importantly, after observing these individuals at the hearing, the court has confidence that they are willing and able to render a fair decision untainted by their previous discussions or decisions. The testimony and demeanor of the board members during the hearing showed that they take their jobs seriously and work hard, without pay, to serve the community and want to do the right thing. Each board member also testified that he or she could be open-minded and would be willing to render a decision different than the decision reached on May 11, 2009, if presented with different evidence.

It will be incumbent on each of the members of the Board to assess their own state of mind and satisfy themselves that they can be open-minded and fair and that they will disregard their previous decision or, at a minimum, treat it as only a tentative decision. If any of them have any doubt that they can do that or any question about their ability to reach a fair decision in light of all the evidence, it would be their duty to recuse themselves from participation in the due process hearing as Foster did.

The court is therefore confident that the individual

board members are fully capable and willing to disregard the decision they made on May 11, 2009, and preside over plaintiff's due process hearing with impartiality and an open mind. See Withrow, 421 U.S. at 47-55 (discussing cases when, consistent with due process, an administrative or judicial decisionmaker investigated or rendered a decision on an issue and also presided over a subsequent due process hearing); Ferguson v. Bd. of Trs. of Bonner County Sch. Dist. No. 82, 564 P.2d 971 (Idaho 1977) (holding that, despite an improper notice that suggested the school board had already decided to discharge plaintiff, allowing the school board to conduct the due process hearing comported with due process because "the record suggests that the board was prepared to deal fairly and openmindedly with the issue").

At that hearing, the board members should listen to and consider all of the relevant evidence so as to make an informed decision about whether the Vo-Ag Program will be offered for the 2009-2010 school year and whether plaintiff's contract to teach the Vo-Ag Program, a modified Vo-Ag Program, or different classes will be renewed. For example, plaintiff has indicated that she wishes to present evidence about 1) the number of students who are interested in continuing in the Vo-Ag Program; 2) the annual cost of the Vo-Ag Program; 3) testimony from community members about improper considerations that affected Noland's recommendation or any board member's prior decision to terminate the Vo-Ag Program or plaintiff's position; 4) other positions that plaintiff may be qualified to teach; and 5) plaintiff's ability to train for and successfully run a modified Vo-Ag Program. The court is confident that, after thoughtfully

18

considering all of plaintiff's relevant evidence at the hearing, the Board will reach a just and fair decision that affords plaintiff due process and serves the public's interest.

IT IS THEREFORE ORDERED that plaintiff's motion for a preliminary injunction be, and the same hereby is, GRANTED and the South Lemhi School District No. 292 Board of Trustees' decisions regarding the Vo-Ag Program and non-renewal of plaintiff's contract are hereby set aside. IT IS FURTHER ORDERED that the Board of Trustees is enjoined from enforcing the Superintendent's recommendations of non-renewal of plaintiff's contract and termination of the Vo-Ag Program without holding a fair hearing at which plaintiff has the opportunity to be heard and the Board of Trustees is able to reach a fair and reasoned decision based on all of the evidence.

DATED: August 12, 2009

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE